United States Department of Justice
Office of the United States Trustee
1100 Commerce St.  Room 976
Dallas, Texas  75242
(214) 767-1079
Meredyth A. Kippes, Trial Attorney
State Bar No. 24007882

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re** | § | |
| | § | |
| **Scott Allen Bidwell,** | § | **CASE NO.    24-33412-MVL-7** |
| | § | |
| **Debtor.** | § | |

_____

| | | |
|---|---|---|
| | § | |
| **LISA L. LAMBERT,** | § | |
| **UNITED STATES TRUSTEE,** | § | |
| | § | |
| **PLAINTIFF,** | § | **ADVERSARY NO. 25-_____** |
| | § | |
| **v.** | § | |
| | § | |
| **SCOTT ALLEN BIDWELL,** | § | **HON. MICHELLE V. LARSON** |
| | § | |
| **DEFENDANT.** | § | |

## COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE

NOW COMES Lisa L. Lambert, the United States Trustee for Region 6, and files this Complaint Objecting to Debtor's Discharge (the "Complaint") and would respectfully show the Court the following:

## JURISDICTION AND VENUE

1.    This Complaint is filed in accordance with 11 U.S.C. §§ 307 and 727.  The Court has

**Complaint**                                                    **Page 1 of 59**

jurisdiction to hear and determine this Complaint pursuant to 28 U.S.C. § 157(b)(2)(J) and the

Standing Order of Reference of the United States District Court for the Northern District of

Texas.

2.     Venue of this proceeding is in the United States District Court for the Northern

District of Texas in accordance with 28 U.S.C. § 1409(a).

## PARTIES

3.     The Plaintiff is Lisa L. Lambert, the United States Trustee for Region 6 (the "United

States Trustee").

4.     The Defendant is Scott Allen Bidwell ("Mr. Bidwell" or the "Debtor" or the

"Defendant").  The Defendant may be served at 700 Harwood Trail, Mesquite, Texas 75150,

which is the address listed on his bankruptcy petition.

5.     Counsel for the Defendant is Guy H. Holman of Guy Harvey Holman, PLLC, who

may be served at 8330 Lyndon B. Johnson Freeway, Suite 445, Dallas, Texas 75243, which is

his address of record with the Court as reflected by the Court's docket sheet.

## FACTS

### Commencement of the Bankruptcy Case

6.     The Debtor filed his voluntary Chapter 7 Petition on October 29, 2024 (the "Petition

Date," Main Case Docket Entry No. 1).

7.     Anne Elizabeth Burns was appointed the Chapter 7 Trustee in this case (the

"Trustee").

8.     The deadline to object to discharge under 11 U.S.C. § 727 or to move for dismissal

under 11 U.S.C. § 707(b)(3) was initially set as February 1, 2025 (the "Deadline").

**Complaint**                                                    **Page 2 of 59**

9.    The Trustee obtained an extension of the Deadline to April 4, 2025 on behalf of herself and the United States Trustee.

**<u>Discharge Waiver and Further Extension of Deadline</u>**

10.    After the hearing before this Court on February 25, 2025 (the "February 25th Hearing"), counsel for the United States Trustee sent an email to Debtor's counsel inquiring whether Mr. Bidwell would agree to waive his discharge and outlining the United States Trustee's view of the grounds for denial of the Debtor's discharge.

11.    The United Sates Trustee requested a response by March 4, 2025 because the extended Deadline of April 4, 2025 was one month away.

12.    The Debtor filed his motion to waive discharge (the "Waiver Motion," Main Case Docket Entry No. 31) on March 5, 2025.

13.    On March 31, 2025, Debtor's counsel informed the United States Trustee that the Debtor no longer wished to waive his discharge.

14.    Given that the April 4, 2025 Deadline was less than a week away, the United States Trustee requested an extension of the Deadline for 60 days.

15.    On April 1, 2025, United States Trustee filed an agreed motion to extend the Deadline to June 3, 2025 (Main Case Docket Entry Nos. 44 and 45).

16.    The Court entered orders extending the Deadline to June 3, 2025 (Main Case Docket Entry Nos. 47 and 48).

17.    The Debtor filed his notice of withdrawal of the Waiver Motion (Main Case Docket Entry No. 53) on April 17, 2025.

18.    This Complaint is being filed in advance of the June 3, 2025 Deadline.

**The Debtor's Background**

19.    As of the Petition Date, the Debtor was employed by Dallas Plumbing Air Pros LLC.

20.    Upon information and belief, the Debtor continues to be employed by Dallas Plumbing Air Pros LLC.

21.    Initially referring to Dana Bidwell as his "ex-spouse," the Debtor, throughout the multiple hearings and section 341 meetings in this case, has interchangeably referred to Dana Bidwell as his ex-spouse, ex-wife, and wife.

22.    The Debtor has testified that he and Dana Bidwell are not divorced, that they have been separated for five years, and that they have not filed for divorce.

23.    The Debtor also has a girlfriend whom he refers to interchangeably as his fiancée and his girlfriend.

**The One Source Sale**

24.    In accordance with the Asset Purchase Agreement (the "APA") dated September 9, 2020 the Debtor and his brothers, Jason Bidwell and Mike Bidwell (together with the Debtor, the "Bidwell Brothers"), sold One Source Service, LLC ("One Source") to Air Pros Solutions, LLC[1] ("Air Pros") (the "One Source Sale").

25.    The consideration under the APA for the One Source Sale was at total of $10 million, of which $4 million was assumed debt and $6 million was cash to be paid with an upfront payment of $200,000.00 followed by monthly payments of $30,000.00.

26.    If the cash portion of the consideration was not paid within twelve (12) months of the closing of the APA, the monthly payments would increase by the terms of the APA to

---

[1] Air Pros and certain affiliates filed their own chapter 11 bankruptcy cases on March 16, 2025, *In re AFH Air Pros, LLC, et al.*, Case No. 25-10356, United States Bankruptcy Court for the Northern District of Georgia.

$45,000.00.

27.     On April 7, 2022, Air Pros and the Bidwell Brothers executed the Amendment to the APA dated April 7, 2022 (the "2022 Amendment") reducing the balance of the purchase price to $2.9 million (the "New Purchase Price").

28.     Under the 2022 Amendment, Air Pros would pay the New Purchase Price in a lump sum payment of $1.25 million by wire transfer on or before April 12, 2022, leaving a remaining balance of $1.65 million of the New Purchase Price.

29.     Under the 2022 Amendment, Air Pros would make thirteen (13) consecutive monthly payments to the Bidwell Brothers in the amount of $25,000.00 due on the fifteenth day of the month, reducing the balance of the New Purchase Price to $1.325 million.

30.     Under the 2022 Amendment, Air Pros would pay the $1.325 million balance within forty-five (45) days after the final monthly installment, subject to Air Pros' right of set off.

31.     The Debtor testified multiple times that the Bidwell Brothers had an informal, unwritten agreement to split the proceeds of the One Source Sale, with the Debtor receiving 40%, Jason Bidwell receiving 40%, and Mike Bidwell receiving 20% (the "Informal 40/40/20 Deal").

32.     The Debtor testified that "several settlements and changes" were made to the APA and the 2022 Amendment "because of slow pay." Transcript of Expedited Motion to Compel Turnover, *In re Bidwell* Case No. 24-33412-MVL-7, p. 14, ln. 3-4 (the "February 25[th] Transcript").

33.     The Debtor testified that he received a $45,000.00 postpetition payment from Air Pros in December of 2024 and a $45,000.00 postpetition payment from Air Pros in January of

2025 as final payments to him from the One Source Sale.  February 25, 2025 Transcript, at p. 15.

34.     At the March 19th Hearing, the Debtor testified that he settled on $90,000.00 as the final amount Air Pros should pay to him so that he would "be done" and further testified that the $90,000.00 was "[j]ust a number off the top of [his] head."  Transcript of Continued Hearing on Motion to Compel Turnover, *In re Bidwell* Case No. 24-33412-MVL-7, March 19, 2025, at p. 39., ln. 2-8 (the "March 19th Transcript").

35.     The Debtor further testified that the remaining balance in the amount of $141,300.00, which he calculated in his head, was due and owing to Jason Bidwell and Mike Bidwell, but not to the Debtor.  February 25, 2025 Transcript, at pp. 15-17.

## The Debtor's Schedules and Statement of Financial Affairs

36.     Contemporaneously with the filing of his Petition, the Debtor filed his Schedules A/B through J (collectively, the "Schedules" and each a "Schedule," Main Case Docket Entry No. 1) on October 29, 2024.

37.     Contemporaneously with the filing of his Schedules, the Debtor filed the Declaration About an Individual Debtor's Schedules (the "Schedules Declaration," Main Case Docket Entry No. 1) in which he declared, "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."

38.     Contemporaneously with the filing of his Petition, the Debtor filed his Statement of Financial Affairs (the "SOFA," Main Case Docket Entry No. 1) on October 29, 2024.

39.     The Debtor signed the SOFA and declared that "I have read the answers on the Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property,

or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571."

40.    At the conclusion of the February 25th Hearing, the Court directed the Debtor to amend Schedules I and Schedule J to facilitate resolution of the Trustee's Motion to Compel Turnover of Property of the Estate (the "Turnover Motion," Main Case Docket Entry No. 18).

41.    When referred to herein separately, Schedule I filed at Main Case Docket Entry No. 1 shall be referred to as "Original Schedule I."

42.    When referred to herein separately, Schedule J filed at Main Case Docket Entry No. 1 shall be referred to as "Original Schedule J."

43.    The Debtor filed his amended Schedule I (the "Amended Schedule I") and amended Schedule J (the "Amended Schedule J") on March 5, 2025 at Main Case Docket Entry No. 30.

44.    Contemporaneously with the filing of Amended Schedule I and Amended Schedule J, the Debtor filed the Declaration About an Individual Debtor's Schedules (the "Amended Schedules Declaration," Main Case Docket Entry No. 30) in which he declared, "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct."

45.    No other amendments to the Schedules have been filed as of the date of filing of this Complaint.

46.    No amendments to the SOFA have been filed as of the date of the filing of this Complaint.

**The Debtor's Assets**

> **_Real Property_**

47.     The Debtor lists no residential real property on his Schedule A/B.

> **_Vehicles_**

48.     The Debtor lists the following vehicles in Part 2 of his Schedule A/B:

> a.    a 2016 Jeep Cherokee, with approximate mileage of 75,000, valued at $9,875.00;
>
> b.    a 2008 Sea Doo Spark valued at $1,500.00; and
>
> c.    a 2021 Yamaha FX Cruiser valued at $5,500.00.

49.     The Debtor's Schedule D, filed contemporaneously with his Schedule A/B, reflects secured debt for a 2021 Subaru Forester valued at $30,793.00 on Schedule D with the notation "Co-signed for daughter's car (Holding for Another.)," which is not listed on Schedule A/B.

50.     The Debtor testified on March 19, 2025 that the 2021 Subaru Forester is titled in his and Dana Bidwell's names.

51.     The Debtor lists a 2021 Harris Pontoon boat and two trailers on Part 7 of Schedule A/B collectively valued in the amount of $53,600.00.

> **_Personal and Household Items_**

52.     The Debtor lists the following household goods and furnishings in Part 3 of his Schedule A/B:

> a.    One refrigerator, one washer and dryer, one dining room table, four chairs, one living room couch, and three bedroom sets collectively valued at $3,000.00;
>
> b.    One cell phone, four televisions, one laptop, and one tablet collectively valued at $1,200.00;

     c.        Two jet skis collectively valued at $8,000.00;[2]

     d.        Everyday clothing valued at $500.00.

53.     The Debtor's Schedule A/B reflects no collectibles, firearms, jewelry, or non-farm animals.

### *Disclosed Financial Accounts*

54.     The Debtor lists the following checking accounts in Part 4 of his Schedule A/B:

     a.  ENT Bank account with a balance of $2,433.39;

     b.  Bank of America account with a balance of $1,435.00; and

     c.  ENT Bank account with a balance of $0.00.

55.     The Debtor lists the following savings accounts in Part 4 of his Schedule A/B:

     a.  Bank of America account with a balance of $3.52; and

     b.  ENT Bank account with a balance of $9.63.

56.     The Debtor lists a Chase Bank investment account with a balance of $0.09 in Part 4 of his Schedule A/B.

57.     No account numbers for any of the checking, savings or investment accounts were included on Schedule A/B.

58.     The Debtor lists a Dallas Plumbing Air Pros Employer Sponsored Plan with a balance of $21,504.90 in Part 4 of his Schedule A/B.

59.     At the February 25th Hearing, the Debtor testified as follows regarding his bank accounts:

---

[2] It is unclear whether these two jet skis are the same jet skis (the Sea Doo Spark and the Yamaha FX Cruiser) as set forth in Part 2 of the Debtor's Schedule A/B.  To the extent that they are the same two jet skis, the collective value of the Sea Doo Spark and the Yamaha FX Cruiser as disclosed in Part 2 of Schedule A/B is $7,000.00, which is $1,000.00 less than the value of the jet skis listed in Part 7 of Schedule A/B.

```
13  Q    Do you have any other accounts right now that you have any
14  signature authority on?
15  A    No.
16  Q    Have you opened or closed any accounts since your
17  bankruptcy filing?
18  A    No.
```

*See* February 25th Transcript, at p.19, ln.13-17.

### *Undisclosed Financial Accounts*

### **CashApp**

60.    The documentation provided to the United States Trustee in response to the Inquiry Letter (defined *infra*) reflects that the Debtor has, and had prepetition, a CashApp account, which is not disclosed on Schedule A/B.

61.    The Debtor provided to the United States Trustee CashApp statements in his name.

62.    The Debtor did not disclose the CashApp account on Schedule A/B or SOFA 20.

63.    The Debtor's CashApp statement for October 2024 reflects a balance on October 31, 2024 in the amount of $439.85.

64.    The Debtor's Cash App statement for October 2024 reflects no transfers between October 27, 2024 and October 31, 2024.

65.    The Debtor's CashApp statement for November 2024 reflects transfers in the amount of $300.00 and a balance on November 30, 2024 of $139.85.

66.    The Debtor's CashApp statement for January 2025 reflects a beginning balance of $0.00.

**Bank of America**

67.     The documentation provided by the Debtor to the United States Trustee in response to the Inquiry Letter included statements for three Bank of America accounts:

> a. Bank of America Advantage Plus Banking account number ending 5670 ("BofA 5670");
>
> b. Bank of America Advantage Plus Banking account number ending 8826 ("BofA 8826"); and
>
> c. Bank of America Advantage Savings account number ending 8839 ("BofA 8839").

68.     Accordingly, the Debtor did not disclose one of the Bank of America accounts on his Schedule A/B or SOFA 20.

**Navy Federal Credit Union**

69.     The documentation provided by the Debtor to the United States Trustee in response to the Inquiry Letter included combined statements for two Navy Federal Credit Union accounts:

> a. Navy Federal Credit Union EveryDay Checking account number ending 1366 ("NFCU 1366"); and
>
> b. Navy Federal Credit Union Membership Savings account number ending 7548 ("NFCU 7548").

70.     The first Navy Federal Credit Union statement provided by Debtor to the United States Trustee is dated October 17, 2024 to October 19, 2024, which is before the Petition Date.

71.     The Navy Federal Credit Union accounts are not listed on the Schedule A/B.

### Robinhood Securities

72.     The statements for BofA 5670 reflect an instant payment on November 12, 2024 to "Robinhood Securities" ("Robinhood").

73.     Upon information and belief, Robinhood is Robinhood Securities, LLC, a registered broker-dealer for stock investments.

74.     No Robinhood account is reflected on the Debtor's Schedule A/B or SOFA 20.

### Coinbase Account

75.     The documentation provided to the United States Trustee in response to the Inquiry Letter reflects that the Debtor has, and had prepetition, a Coinbase account, which was not disclosed on the Schedule A/B.

76.     The Debtor's Coinbase transaction history for January 1, 2024 to December 31, 2024 reflects the following cryptocurrency assets with the following values in United States dollars as of December 31, 2024:

      a.    AERO, 22.1366308 units, valued at $29.11;

      b.    DOGE, 411.12118423 units, valued at $129.93;

      c.    FLOKI, 302794.614100413 units, valued at $53.56;

      d.    ICP, 7.07363666 units, valued at $69.81;

      e.    LCX, 54.04359606 units, valued at $12.39;

      f.    MANA, 5.6282655 units, valued at $2.62;

      g.    MOG, 6223235.29411765 units, valued at $12.54;

      h.    PEPE, 471441.38877085, valued at $9.42;

      i.    SHIB, 2149327.66256271 units, valued at $45.45;

j.   TURBO, 7114.93205913 units, valued at $64.68;

k.   USDC, 0.006999, valued at $0.01;

l.   XLM, 174.5587492, valued at $57.88;

m.   XRP, 7.516403, valued at $15.64; and

n.   XYO, 1329.05297076 units, valued at $25.23.

77.    The Debtor's Coinbase transaction history for January 1, 2024 to December 31, 2024 reflects that the Debtor deposited $500.00 BofA 5670 on November 11, 2024, less than two weeks after the Debtor's Petition Date, and purchased units of DOGE cryptocurrency that same day.

78.    The Debtor's Coinbase transaction history for January 1, 2024 to December 31, 2024 reflects no transactions from February 23, 2024 through November 10, 2024.

79.    Beginning November 11, 2024, the Debtor regularly bought and sold cryptocurrency through at least December 29, 2024.

80.    The Debtor withdrew a total of $11,467.66 from the Coinbase account in multiple transactions between December 25, 2024 and December 29, 2024.

### *Other Undisclosed Assets*

81.    The Debtor did not disclose on Schedule A/B his entitlement to proceeds from the One Source Sale.

### **The Debtor's Liabilities**

82.    The Debtor's Schedule D reflects the following secured debts:

a.   $65,000.00 owing to Aqua Finance secured by the 2021 Harris Pontoon boat;

b.   $17,612.00 owing to Carmax Auto Finance secured by the 2016 Jeep Cherokee;

**Complaint**                                                                         **Page 13 of 59**

    c.   $13,285.00 owing to Jpmcb Auto secured by a 2021 Subaru Forester for which the Debtor cosigned for his daughter's car;

    d.   $33,426.00 owing to Syncb/Kawasaki secured by two jet skis; and

    e.   $19,394.00 owing to Syncb/Kawasaki secured by two trailers.

83.    Schedule E/F reflects priority unsecured debt in the amount of $48,700.00, consisting of $32,000.00 owing to the Colorado Department of Revenue and $16,700.00 owing to the Internal Revenue Service.

84.    Schedule E/F reflects general unsecured debt in the amount of $1,283,832.85.

**Executory Contracts and Unexpired Leases**

85.    Schedule G reflects an apartment lease with Jeovany Aguilar under which the Debtor is the lessee.

86.    The Debtor's address set forth on his Petition is 700 Harwood Tr., Mesquite, TX 75105, which upon information and belief is a house.

**Schedule I and Amended Schedule I**

87.    Original Schedule I reflects gross monthly income in the amount of $12,083.33.

88.    Amended Schedule I reflects gross monthly income in the amount of $13,333.34.

89.    At the hearing before the Court on March 19, 2025 (the "March 19th Hearing"), the Debtor testified that the difference in his salary between Original Schedule I and Amended Schedule I is that he received a raise at the end of 2024.

90.    Original Schedule I reflects a total amount of $2,306.01 in payroll deductions consisting of the following:

    a.   $390.20 for tax, Medicare and Social Security;

    b.   $0.00 for mandatory contributions for retirement plans;

    c.   $362.51 for voluntary contributions for retirement plans;

    d.   $191.53 for required repayments of retirement fund loans;

    e.   $758.98 for insurance;

    f.   $0.00 for domestic support obligations;

    g.   $0.00 for union dues;

    h.   $362.51 for PX401EEPre;

    i.   $161.59 for MetLegal, Vol STD, VOL LTD; and

    j.   $78.69 for Accident, Critical EE, Hospital.

91.     Amended Schedule I reflects a total amount of $5,635.07 in payroll deductions consisting of the following:

    a.   $2,583.36 for tax, Medicare, and Social Security;

    b.   $0.00 for mandatory contributions for retirement plans;

    c.   $933.34 for voluntary contributions for retirement plans;

    d.   $191.53 for required repayments of retirement fund loans;

    e.   $58.98 for insurance;

    f.   $0.00 for domestic support obligations;

    g.   $0.00 for union dues;

    h.   $1,066.67 for PXROTH401EE;

    i.   $22.49 for MetLegal; and

    j.   $78.69 for Accident, Critical EE, Hospital.

92.     At the March 19th Hearing, the Debtor testified that the deductions on Original

Schedule I are from when they "did the first run-through" of Original Schedule I, that he was filling out Original Schedule I with one of his counsel's assistants on an impromptu, snap decision basis and that he "didn't know that it had to be exact." March 19th Transcript, at p.11, ln. 11-18.

93.     He added that he "was just answering questions . . . and [he] signed whatever she put in there." March 19th Transcript, at p. 11, ln 19-21.

94.     At the March 19th Hearing, the Debtor testified that he obtained the payroll deduction numbers on his Amended Schedule I from his paycheck, his bank statements and all of his bills. March 19th Transcript, at p. 12, ln 2-4.

95.     Original Schedule I listed $0.00 for other monthly income on line 8h.

96.     Amended Schedule I listed $1,600.00 for roommate contributions on line 8h.

97.     Amended Schedule I reflects that the roommate contributions on Line 8h "will end June 1, 2025."

98.     At the March 19th Hearing, the Debtor testified that he would lose $1,200.00 of the $1,600.00 listed on Line 8h of Amended Schedule I because only one of his roommates is moving out. March 19th Transcript, at p. 14, ln. 9-10.

99.     The Debtor testified that his other roommate pays $400.00 "in rent and expenses . . . plus utilities." March 19th Transcript, at p. 14, ln. 10-11.

100.    Original Schedule I reflects a combined monthly income of $9,777.32.

101.    Amended Schedule I reflects a combined monthly income of $9,298.28.

**Schedule J and Amended Schedule J**

102.    The Debtor generally testified at the March 19th Hearing that his Original

Schedule J was filled out in early 2024, when his first approached his counsel about filing bankruptcy.

103.    Original Schedule J, filed on October 29, 2024, reflects that the Debtor has a son, aged 18, and a daughter, aged 20.

104.    Amended Schedule J, filed four months and seven days later on March 5, 2025, reflects that the Debtor has a son, aged 20, and a daughter, aged 22.

105.    At the March 19th Hearing, the Debtor testified that his daughter is 21 years old. March 19th Transcript, at p. 17, ln. 25.

106.    Original Schedule J reflects rental or homeowners expenses for the Debtor's residence in the amount of $2,875.00.

107.    Amended Schedule J reflects rental or homeowners expenses for the Debtor's residence in the amount of $2,975.00.

108.    Original Schedule J reflects a total amount of $7,323.00 in additional monthly expenses, consisting of the following:

    a.    $300.00 for electricity, heat, natural gas;

    b.    $109.00 for water, sewer, garbage collection;

    c.    $430.00 for telephone, cell phone, internet, satellite, and cable services;

    d.    $800.00 for food and household supplies;

    e.    $100.00 for clothing, laundry, and dry cleaning;

    f.    $200.00 for personal care products and services;

    g.    $300.00 for medical and dental expenses;

    h.    $400.00 for transportation;

    i.   $100.00 for entertainment, clubs, recreation, newspapers, magazines, and books;

    j.   $100.00 for charitable contributions and religious donations;

    k.   $350.00 for vehicle insurance;

    l.   $459.00 for car payments for Vehicle 1; and

    m.  $800.00 for boat payment.

109.    Amended Schedule J reflects a total amount of $13,088.00 in additional monthly expenses, consisting of the following:

    a.   $724.00 for telephone, cell phone, internet, satellite, and cable services;

    b.   $800.00 for food and housekeeping supplies;

    c.   $100.00 for clothing, laundry, dry cleaning;

    d.   $200.00 for personal care products and services;

    e.   $300.00 for medical and dental expenses;

    f.   $400.00 for transportation;

    g.   $439.00 for vehicle insurance;

    h.   $575.00 for car payment for Vehicle 1;

    i.   $575.00 for car payment for Vehicle 2;

    j.   $800.00 for boat payment;

    k.   $2,500.00 for payments of alimony, maintenance and support; and

    l.   v\$2,500.00 for payments of significant other's household expenses.

110.    At the March 19th Hearing, the Debtor could not explain why the amount for telephone, cell phone, internet, satellite, and cable services increased from $430.00 on Original

**Complaint**                                                         **Page 18 of 59**

Schedule J to $724.00 Amended Schedule J. March 19th Transcript, p. 16, ln. 12-16.

111.    At the March 19th Hearing, the Debtor testified that, although the car payment numbers on his Original Schedule J and Amended Schedule J differ, "the car payments haven't changed." March 19th Transcript, at p. 18, ln.15-21.

112.    Amended Schedule J lists $0.00 for monthly electricity, heat, natural gas expenditures while the Debtor's Original Schedule J lists $300.00 for monthly electricity, heat, natural gas expenditures.

113.    Amended Schedule J lists $0.00 for monthly water, sewer, garbage collection expenditures while Original Schedule J lists $109.00 for monthly water, sewer, garbage collection expenditures.

114.    Original Schedule J lists $0.00 for monthly alimony, maintenance and support, while Amended Schedule J lists $2,500.00 for monthly alimony, maintenance and support.

115.    The Debtor testified that the monthly alimony, maintenance and support payments are paid to Dana Bidwell and to his girlfriend.

116.    The Debtor testified that there is no court order requiring him to pay Dana Bidwell.

117.    The Debtor testified that there is no court order requiring him to pay his girlfriend.

118.    Original Schedule J lists $0.00 for car payment for Vehicle 2 while Amended Schedule J lists $575.00 for car payment for Vehicle 2.

119.    The Debtor's vehicle insurance expenditure on Amended Schedule J is higher than his vehicle insurance expenditure on Original Schedule J.

120.    The Debtor's car payment for Vehicle 1 expenditure on Amended Schedule J is higher than the Debtor's car payment for Vehicle 1 expenditure on Original Schedule J.

121.    Original Schedule J reflects monthly net income of $2,454.32.

122.    The Debtor's Amended Schedule J reflects monthly net income of negative $3,789.72.

## The Debtor's Statement of Financial Affairs

123.    The Debtor did not list the prepetition income he received from the One Source Sale on SOFA 5.

124.    The Debtor did not list on SOFA 13 transfers he made to Dana Bidwell within two years before the Debtor filed for bankruptcy.

125.    The Debtor did not list on SOFA 13 transfers he made to his girlfriend within two years before the Debtor filed for bankruptcy.

126.    The Debtor did not list on SOFA 18 transfers he made to Jason Bidwell within two years before he filed for bankruptcy.

127.    The Debtor did not list on SOFA 18 transfers he made to Mike Bidwell within two years before he filed for bankruptcy.

128.    The Debtor did not list on SOFA 18 transfers he made to Dana Bidwell within two years before he filed for bankruptcy.

129.    The Debtor did not list on SOFA 18 transfers he made to his girlfriend within two years before he filed for bankruptcy.

## The United States Trustee's Informal Inquiry Letter

130.    On February 14, 2025 the United States Trustee sent an informal inquiry letter to

Debtor's counsel requesting the following categories of documents (the "Requested Documents"):

    a. 2022 and 2023 individual and business tax returns with all schedules and statements;

    b. Any 2024 W-2 and/or 1099 forms received;

    c. Financial and bank statements for all accounts listed on the debtor's Schedule A/B, including those for One Source Home Service, with supporting check detail for the period from January 1, 2023, to present, including 401(k)s, e-currency, PayPal, Venmo, CashApp, and similar accounts;

    d. Asset Purchase Agreement between Air Pros Solutions and One Source Home Service, Amended Asset Purchase Agreement between Air Pros Solutions and One Source Home Service, and any other amendments to the APA between Air Pros Solutions and One Source Home Service; and

    e. Any applications and associated documents for any Paycheck Protection Plan Loans and/or Economic Injury Disaster Loans applied for and/or received by the debtor or any business operated by the debtor.

131. The United States Trustee gave a deadline of February 28, 2025 for the Debtor to deliver the Requested Documents to the United States Trustee.

132. On February 24, 2025, Debtor's counsel sent the following documents to the United States Trustee:

    a. The Debtor's 2023 and 2024 Forms W-2;

    b. Statements for the second through fourth quarter of 2023 and the first through fourth quarter of 2024 of the Debtor's Paychex Pooled Employer 401(k) Plan at Dallas Plumbing Air Pros LLC;

    c. Two statements from the Debtor's Bank of America account number ending 5670 account for the periods of December 21, 2024 to January 23, 2025 and January 24, 2025 to February 20, 2025;

    d. CashApp statements for January 2023 through December 2023 and for January 2025;

e.   Chase account number ending 9322 statements for January 2023 through December 2023 and for the period of January 17, 2025 through February 18, 2025; and

f.   Coinbase account statements for January 2023 through December 2023 and for January 2025.

133.   On April 8, 2025, Debtor's counsel sent a second set of documents to the United States Trustee consisting of the following:

a.   The Debtor's 2022 and 2023 tax returns;

b.   The APA;

c.   The 2022 Amendment;

d.   Chase account number ending 9322 statements for January 2024 through December 2024;

e.   Bank of America account number ending 5670 account statements for the period of January 30, 2024 through December 20, 2024;

f.   Bank of America combined statements for account number ending 8826 and account number ending 8839 account statements for the period of December 3, 2023 through December 10, 2024;

g.   CashApp statements for January 2024 through December 2024 and for January 2025;

h.   A Coinbase statement for the period of January 1, 2024 through December 31, 2025;

i.   ENT account number ending 0540 for the period of September 1, 2020 through December 2024; and

j.   Navy Federal Credit Union combined statements for account number ending 1366 and account number ending 7548 for the period of October 17, 2024 through March 19, 2025.

134.   The Debtor has testified that there are further amendments to the APA beyond the 2022 Amendment that were embodied in emails, which emails the Debtor has not produced to

the United States Trustee.

135.   Debtor's counsel represented to the United States Trustee via email that the Debtor does not have any bank statement for One Source because he was not an owner, but a key employee and the brother of the owner of One Source.

136.   Debtor's counsel represented via email that the Debtor has no business tax returns.

137.   Debtor's counsel represented via email that the Debtor does not have a Venmo account or PayPal account.

138.   As of the filing of this Complaint, no further Requested Documents have been delivered to the United States Trustee.

**The Section 341 Meeting of Creditors**

139.   The section 341 meeting of creditors in this case was originally set on December 3, 2024 (the "Meeting of Creditors").

140.   Although Mr. Bidwell was on the section 341 meeting Zoom on December 3, 2024, before his case was called, Mr. Holman informed the Trustee that Mr. Bidwell had to get off the Zoom for a family emergency.  The Trustee continued Meeting of Creditors to January 14, 2025.

141.   The January 14, 2025 Meeting of Creditors was continued to January 20, 2025 (the "January 20th Meeting").

142.   The Debtor testified that he had not within the two years prior to filing for bankruptcy transferred, given, gifted, or disposed of any cash or money or assets in excess of $10,000 to anyone, anybody or any entity.  *In re Bidwell* Case No. 24-33412-MVL-7, January

20, 2025, at pp.10-11, ln. 23-2 (the "January 20th Transcript").

143.    The Debtor further testified that he and his brothers short sold One Source in September 2020. January 20th Transcript, at p. 6, ln. 7-9.

144.    The Debtor testified that the purchase price of One Source was $4 or $5 million, in which a lump sum was paid followed by a payment stream. January 20th Transcript, at p. 11, ln. 15-19.

145.    The Debtor further testified that the last payment he received for the purchase of One Source was $10,000.00 in December 2024.  January 20th Transcript, p. 14, ln. 2-5.

146.    The Debtor testified that he also received a $10,000.00 payment of One Source Sale proceeds in November of 2024. January 20th Transcript, at p. 14, ln. 11-13.

147.    The Debtor further testified that he had used the payment that he just received from the purchaser of One Source to pay his 2023 tax liability in the amount of $17,000.00. January 20th Transcript, at p. 15, ln. 2-5.

148.    The Debtor further testified that the payments to him from the One Source Sale had ceased, but that his brothers, Jason Bidwell and Mike Bidwell, still received payments. January 20th Transcript, at p. 15, ln. 10-14.

149.    The Trustee requested that the Debtor provide to her the APA, the 2022 Amendment, and all of the Debtor's bank statement for the last year. January 20th Transcript, at p. 19, ln. 5-8.

150.    The Trustee continued the Meeting of Creditors to February 11, 2025.

151.    The continued Meeting of Creditors was held on February 11, 2025 (the "February 11th Meeting").

152.    At the February 11th Meeting, the Debtor testified that he had received postpetition payments of $25,000.00 in November 2024, $45,000.00 in December 2024, and $45,000.00 in January 2025,[3] which were payments of One Source Sale proceeds due to the Debtor at the time he filed his chapter 7 petition. Transcript of Meeting of Creditors, *In re Bidwell* Case No. 24-33412-MVL-7, February 11, 2025, at p. 7, ln 15-17 (the "February 11th Transcript").

153.    The Debtor testified that he had purchased an engagement ring for his girlfriend, that he had proposed to her, and that she had accepted his proposal.  February 11th Transcript, at p. 13, ln. 9-12.

154.    Two weeks later, at the February 25th Hearing, the Debtor repudiated his testimony that he had proposed to his girlfriend explaining, rather, that there was an understanding between the two of them that he would propose to her at some point in the future. February 25th Transcript, at pp. 40-41.

155.    The Trustee continued the February 11th Meeting to March 11, 2025 requesting (i) an accounting of all the funds under the APA that have flowed from Air Pros to the Bidwell Brothers; (ii) the second amended to the APA referenced by Mr. Bidwell; (ii) the contact information of the two other principals of One Source, Mike Bidwell and Jason Bidwell;  (iii) a summary of the events and how everything worked with the APA; (iv) amendments to the Debtor's schedules to reflect any missing financial accounts; and (v) financial statements including the balance of the Debtor's bank statements for January 2025, the Debtor's Coinbase statements from 2024 to date, and the Debtor's Cash App statements from 2024 to date.

---

[3] These payments, together with additional deposit of $15,700.00 in December 2024, shall be referred to herein as the "Air Pros Payments."

February 11th Transcript, at p. 26-27.

156.    The continued Meeting of Creditors was held on March 11, 2025 (the "March 11th Meeting").

157.    The Debtor was not present at the March 11th Meeting due to a scheduling error.

158.    The Trustee continued the March 11th Meeting to April 8, 2025.

159.    The continued meeting of creditors was held on April 8, 2025 (the "April 8th Meeting").

160.    The Trustee examined the Debtor about his Amended Schedule I and Amended Schedule J.

161.    The Debtor testified that, as of March and April of 2025, he had been making both retirement contributions set forth on his Amended Schedule I. Transcript of Meeting of Creditors, *In re Bidwell* Case No. 24-33412-MVL-7, April 8, 2025, at pp. 4-5 (the "April 8th Transcript").

162.    The Debtor further testified that he discontinued his retirement fund contributions due to the chapter 11 bankruptcy filing of Air Pros, his employer.  April 8th Transcript, at p. 5, ln 18-22.

163.    The Debtor testified that his roommate would be leaving by the end of May 2025. April 8th Transcript, at p. 6, ln. 5-10.

164.    The Debtor further testified that his home lease ends in June 2025 and that he has not determined whether he would renew the lease.  April 8th Transcript, at p. 6, ln. 14-22.

165.    The Debtor testified that he is making payments on his Jeep Cherokee and his daughter's Subaru.  April 8th Transcript, at p. 7, ln. 4-8.

166.    The Debtor testified that he had not made the last two payments on his pontoon boat and that he planned to surrender the pontoon boat.  April 8th Transcript, at p. 7, ln. 12-22.

167.    The Debtor testified that even though he had paid $17,500.00 "in or around January to [his] ex, which was to advance-pay the $2,500.00 a month for however many months that covered" he "had to" send an extra $2,500.00 in March 2025 and April 2025.  April 8th Transcript, at p. 8, ln. 18-24.

168.    The Debtor testified that he closed his Bank of America account number ending 8826 in "June or July or something" of 2024 because there had been fraud on that account.  April 8th Transcript, at pp. 12-13.

169.    The Debtor testified that he had opened the Navy Federal Credit Union account in November of 2024. April 8th Transcript, at p. 10, ln. 19-21.

170.    The Trustee requested that the Debtor provide to her (i) the contact information of Jason Bidwell and Mike Bidwell; (ii) emails or other written amendments to the APA and the 2022 Amendment; (iii) copies of the Debtor's Navy Federal Credit Union statements for the last year; and (iv) copies of bank statements from the two Bank of America accounts that are not the one ending in 5670.  April 8th Transcript, at p. 9 and pp. 14-15.

171.    The Trustee continued the April 8th Meeting to May 6, 2025 so that she and her counsel could review the accounting of the disposition of the One Source sales proceeds the Debtor had been ordered to file with the Court.

172.    The continued meeting of creditors was held on May 6, 2025 (the "May 6th Meeting").

173.    At the May 6th Meeting, the Debtor represented that he is preparing an amended

SOFA to reflect the accounting he submitted to the Court concerning the sale of One Source to Air Pros.

174.    The Trustee concluded the Meeting of Creditors at the May 6th Meeting.

**The Disposition of the Air Pros Payments**

175.    The Debtor's bank statements provided to the United States Trustee by the Debtor in response to the Inquiry Letter shed light on the disposition of the Air Pros Payments.

### *The November 15th Deposit*

176.    The statements from the Debtor's ENT account number ending 0540 ("ENT 0540") reflect an incoming wire transfer from Air Pros on November 15, 2024 in the amount of $25,000 (the "November 15th Deposit").

177.    The statements from ENT 0540 reflect four outgoing wire transfers on November 15, 2024.

178.    The Debtor wired $10,000.00 to Brandon Bidwell on November 15, 2024.

179.    The Debtor wired $5,500.00 to Mike Bidwell on November 15, 2024.

180.    The Debtor wired $3,000.00 to Dana Bidwell on November 15, 2024.

181.    The Debtor wired $6,000.00 to BofA 5670 on November 15, 2024.

182.    The October 24, 2024 to November 20, 2024 statement for BofA 5670 reflects multiple expenditures in Florida after November 15, 2024, including $240.00 at a golf club in Tarpon Springs, Florida.

183.    The November 21, 2024 to December 20, 2024 statement for the BofA 5670 reflects an expenditure at Nike.com on December 12, 2024 in the amount of $444.81.

184.    The Debtor's statements for the Debtor's BofA 5670 for the periods of October

24, 2024 to November 20, 2024 and November 21, 2024 to December 20, 2024 reflect transfers to Coinbase.com in the total amount of $8.455.00 prior to December 13, 2024 (the date of the December 13th Deposit, defined *infra*).

185.    The November 21, 2024 to December 20, 2024 statement for the Debtor's Bank of America account number ending 5670 reflects expenditures with American Airlines and Dallas/Fort Worth Airport before the December 13th Deposit.

186.    The November 21, 2024 to December 20, 2024 statement for BofA 5670 reflects high dollar dining out expenditures before the December 13th Deposit as follows:

   a.   $300.00 on November 25, 2024 at Hooters;

   b.   $158.43 and $21.13 on December 4, 2024 at Outback Steakhouse;

   c.   $111.79 on December 5, 2024 at Outback Steakhouse;

   d.   $219.93 and $10.00 on December 9, 2024 at Razoo's; and

   e.   $234.04 on December 9, 2024 at Sports City Café.

### *The December 13th Deposit*

187.    The statements for the ENT 0540 reflect an incoming wire transfer from Air Pros on December 13, 2024 in the amount of $45,000.00 (the "December 13th Deposit").

188.    The statements for ENT 0540 reflect an outgoing wire transfer on December 13, 2024 to Dana Bidwell in the amount of $17,500.00.

189.    The statements for ENT 0540 reflect an outgoing wire transfer to BofA 5670 on December 13, 2024.

190.    The statements for BofA 5670 reflect transfers to Coinbase.com in the total amount of $6,025.00 after the December 13th Deposit.

191.    The statements for BofA 5670 reflect a total of $3,324.09 at Rowlett Bowl-a-Rama on December 16, 2024.

192.    The statements for BofA 5670 reflect a transfer of $1,510.92 to HexClad Cookware on December 16, 2024.

193.    The statements for BofA 5670 reflect a transfer of $886.50 on December 16, 2024 to "SP MR CIRCULATE TODASHI," which, upon information and belief, is a luxury/designer good resale website.

194.    The statements for BofA 5670 reflect a transfer to "FEKOMIGLOBALNIG LAGOS" in the amount of $1,000.00 on December 18, 2024.

195.    The statements for BofA 5670 reflect a transfer to Style Quest Fashion on December 19, 2024 in the amount of $1,074.43.

196.    The statements for BofA 5670 reflect two transfers on December 20, 2024 to "PAYMTNZ*ADPRONETW Ciudad de mex" totaling $1,869.22.

### *The December 16th Deposit*

197.    The statements from ENT 0540 reflect an incoming wire transfer from Air Pros on December 16, 2024 in the amount of $15,700.00 (the "December 16th Deposit").

198.    The statements for ENT 0540 reflect an outgoing wire transfer on December 16, 2024 to Brandon Bidwell[4] in the amount of $10,000.00.

199.    The statements for ENT 0540 reflect an outgoing wire transfer on December 16, 2024 to Mike Bidwell in the amount of $5,700.00.

200.    The statements for ENT 0540 reflect no outgoing wires to the Debtor on

---

[4] Upon information and belief, Brandon Bidwell is Jason Bidwell's son.

**Complaint**                                                                                              **Page 30 of 59**

December 16, 2024.

### *The January 9th Deposit*

201.    On January 9, 2025 $45,000.00 was wired to NFCU 1366 (the "January 9th Deposit").

202.    The balance in NFCU 1366 as of January 7, 2025 was $4.47.

203.    On January 9, 2025, after receipt of the January 9th Deposit, Debtor transferred $6,500.00 from NFCU 1366 to NFCU 7548.

204.    On January 15, 2025, the Debtor transferred that $6,500.00 back to NFCU 1366 from the Debtor's NFCU 7548.

205.    The following amounts were deducted from NFCU 1366 for the period December 20, 2024 to January 19, 2025:

   a.   A $3,500.00 ACH transfer to Scott A. Bidwell on January 10, 2025;

   b.   A Visa direct debit card transaction to "*melissa Pow" in the amount of $750.00 on January 10, 2025;

   c.   A total of $5,000.00 in transfers to Coinbase, Inc. on January 10, 2025;

   d.   A transfer of $17,677.13 to the IRS on January 10, 2025;

   e.   An ACH transfer to Dana Bidwell in the amount of $500.00 on January 13, 2025;

   f.   A debit card transaction in the amount of $1,000.23 with Tearway Express Festac on January 13, 2025 and a related international transaction fee of $10.00;

   g.   A debit card transaction in the amount of $1,500.10 with*sourceofwork* San Salvador on January 13, 2025 and a related international transaction fee of $15.00;

   h.   A total of $339.90 in expenditures at DXL.com, which is, upon information and belief, an online men's clothing store;

**Complaint**                                                                          **Page 31 of 59**

      i.   A total of $202.80 in Doordash.com expenditures;

      j.   A debit card transaction at Nike.com on January 13, 2025 in the amount of $383.17;

      k.   A debit card transaction at Daikin Mesquite 41 on January 13, 2025 in the amount of $567.58;

      l.   A total of $7,504.43 in debit card transactions on January 15, 2025 at Sr Dallas II, which upon information and belief is Spearmint Rhino Gentlemen's Club in Dallas, Texas;

      m.   A debit card transaction at Sports City Café in Mesquite, Texas on January 16, 2025 in the amount of $346.62; and

      n.   A total of $3,419.00 in ATM withdrawals.

206.    NFCU 1366 reflects a POS Credit Adjustment and "Chocktaw Durant Res" in the amount of $735.38 on January 21, 2025.

207.    NFCU 1366 reflects six different ATM withdrawals in the amount of $505.00 on January 21, 2025 for a total of $3,030.00.

208.    NFCU 1366 reflects a debit card transaction at "Choctaw Durant Res" in the total amount of $1,043.05.

**The Trustee's Motion to Compel Turnover of Property of the Estate**

209.    On February 14, 2025, the Trustee filed her Turnover Motion seeking turnover of the Air Pros Payments from the Debtor.

### *The February 25th Hearing*

210.    The Court held a hearing on the Turnover Motion on February 25, 2025 (the "February 25th Hearing").

211.    The Debtor testified at the February 25th Hearing that the entire amount of the

payments from Air Pros for the purchase of One Source were wired to the Debtor's account until October of 2024.  February 25th Transcript, at p.13, ln. 9-13.

212.   When asked what changed in October of 2024, the Debtor testified, "I no longer have any payments due to me." February 25th Transcript, at p. 13, ln. 14-16.

213.   The Debtor later acknowledged receiving wire transfers of Air Pro Payments in December 2024 and January 2025. February 25th Transcript, at p. 14, ln. 9-14.

214.   The Debtor further testified that, upon receipt of a payment from Air Pros, he would wire payments to Jason Bidwell and Mike Bidwell according to the Informal 40/40/20 Deal.  February 25th Transcript, at p. 13, ln. 15-23.

215.   The Debtor testified that he did not keep a written accounting of the distributions of the payments from Air Pros to his brothers, but, rather, kept track of those distributions in his head.  February 25th Transcript, at pp. 20-21.

216.   When asked by his counsel how much he has received from the One Source Sale over time, the Debtor testified that he did not "have that number without going through statements and adding it up."  February 25th Transcript, at p. 27, ln. 10-14.

217.   The Debtor reiterated that he kept no written record of the transfers and payments of the One Source Sale proceeds and kept it all in his head by subtracting Air Pros' payments from the balance due, also held in his head, on One Source Sale.  February 25th Transcript, at p. 27, ln. 12-20.

218.   The Debtor used the following example to illustrate how he kept track of the Air Pros payments in his head:  "In other words, if you owe me $1 million and you gave me $300,000, I now know you owe me $600,000.  I don't keep track of what was already paid.  It's

in my head is I guess what I'm saying."  February 25th Transcript, at p. 27, ln.17-20.

219.    The Court corrected Mr. Bidwell's mental math, pointing out that the balance would be $700,000.00, not $600,000.00, in the Debtor's example.  February 25th Transcript, at. p. 27, ln. 21-22.

220.    Mr. Bidwell acknowledged his math error.  February 25th Transcript, at p. 28.

221.    Regarding the disposition of the Air Pros Payments, the Debtor testified that he paid "18,000  roughly, 17,000 and change" to the IRS. February 25th Transcript, at p. 23, ln. 8.

222.     Regarding the disposition of the Air Pros Payments, the Debtor testified that he gave $17,000.00 to his spouse, Dana Bidwell, as an advance payment of a monthly payment that he "had been paying over the course of the last five years after [they] split up."  February 25th Transcript, at p. 23, ln. 11-15.

223.    The Debtor's testimony at the February 25th Hearing suggested that the approximately $17,000.00 payment to Dana Bidwell was in the nature of support.

```
1  Q    Do you have any sort of child support payments that are
2  due to your wife, your estranged spouse?
3  A    Nothing court-ordered, ma'am.  I was the sole earner all
4  of our lives and when we split up, I just have been helping her
5  out every month I could, giving her payments, you know, monthly
6  since the time I've left.
```

*See* February 25th Transcript, p. 32, ln. 1-6.

224.    Two weeks earlier, at the February 11th Meeting, the Debtor testified that the approximately $17,000.00 payment for Dana Bidwell was to help pay mutual debts. February 11th Transcript, p. 16, ln. 22-23.

```
19  Q   -- funds to Dana, are those court ordered?

20  A   They're not.

21  Q   Okay.  Is it contractual?

22  A   It's not.  When we separated, we had a lot of mutual

23  debts.  And that's me trying to help her pay the mutual

24  debts.
```

*See* February 11th Meeting Transcript, at p. 15, ln.19-24.

225.    The Debtor testified that he used the balance of the Air Pros Payments irresponsibly. February 25th Transcript, at p. 23, ln.15-16.

226.    Specifically, the Debtor testified that he used roughly $55,000.00 remaining from the Air Pros Payments to gamble and do "stupid stuff like that that [*sic*] it whittled down the money." February 25th Transcript, p. 23, ln. 22-23.

227.    The Debtor further testified that he "took [his] friend to a strip club for his 30th birthday" and spent "a decent amount of money there," that he bought some pots and pans, and that he "[g]ambled quite a bit of it." February 25th Transcript, at p. 24, ln.12-15.

228.    The Debtor further testified that he had given $1,500.00 or $2,500.00 of the Air Pros Payments to his fiancée/girlfriend. February 25th Transcript, at p. 24, ln. 3-6.

229.    At the conclusion of the February 25th Hearing, the Court found that Mr. Bidwell's testimony during the hearing was "at best, equivocal." February 25th Transcript, at p. 49, ln. 2-3.

230.    The Court further stated that she was not satisfied with the veracity of the Debtor's Schedules or his testimony at the February 25th Hearing. February 25th Transcript, at p. 49, ln. 3-5.

231.    The Court went on to opine that "at best I found the debtor to give very rough estimates and those estimates tended to change sentence by sentence." February 25th Transcript, at p. 49, ln. 6-8.

232.    The Court continued the hearing on the Turnover Motion to March 19, 2025.

233.    On February 27, 2025, the Court entered the Order Continuing Trustee's Motion to Compel Turnover of Property of the Estate (Main Case Docket Entry No. 27, the "First Continuance Order").

234.    The First Continuance Order provided that the Debtor "shall file with the Court no later than Tuesday March 11, 2025 "[a] full accounting of all funds paid by Air Pros Solutions LLC, to Debtor Scott Bidwell an/or his brothers Jason Bidwell and Mike Bidwell pursuant to the sale of the asset of One Source Home Service, LLC in September 2020. The accounting must state the original obligation, each payment made, any changes to the agreement, and the total amount that each brother received.  Further, the accounting must be sworn under penalty of perjury by all three brothers."

235.    The First Continuance Order also required that the Debtor file an amended Schedule I and amended Schedule J.

### *The March 19th Hearing*

236.    On March 11, 2025, the Debtor filed his Notice of Accounting (Main Case Docket Entry No. 33, the "First Accounting").

237.    The First Accounting reflected the disposition of $876,000.00 of Air Pros sales proceeds payments.

238.    The $876,000.00 set forth in the First Accounting is not, upon information and

belief, the full amount of the money paid to the Bidwell Brothers under the APA and the 2022 Amendment.

239.    The First Accounting did not state the original obligation of Air Pros under the APA.

240.    The First Accounting did not state each payment made by Air Pros under the APA and the 2022 Amendment.

241.    The First Accounting did not state any changes to the APA or the 2022 Amendment.

242.    The First Accounting did not state the total amount of One Source sale proceeds that each brother received.

243.    The First Accounting was not signed by any of the Bidwell Brothers under penalty of perjury.

244.    On March 18, 2025, the Debtor filed the Affidavit of Scott Bidwell (the "Bidwell Affidavit," Main Case Docket Entry No. 36) in which he swore under penalty of perjury that "[t]he accounting of all monies received and entitled from the agreement with Air Pros Solution, LLC and One Source Home Service, LLC was provided by testimony and sworn under penalty of perjury."

245.    The Bidwell Affidavit appears to be signed by Jason Bidwell and Michael Bidwell, but not under penalty of perjury.

246.    The Court held the continued hearing on the Turnover Motion on March 19, 2025 (the "March 19th Hearing").

247.    Counsel for the Trustee argued that the First Accounting was incomplete and did

not comply with the requirements of the First Continuance Order.

248.    Counsel for the Debtor argued that the Debtor did not have the records to be able to create a more detailed accounting.

249.    The Court noted the Debtor's prior testimony that he kept all of the information concerning the disposition of the proceeds of the One Source Sale in his head "[a]nd so, at some point there has to be an accounting, and if the accounting is in your head, then you have to do it." March 19th Transcript, at p.7, ln. 9-11.

250.    Counsel for the Trustee examined the Debtor concerning his Schedule I, his Amended Schedule I, his Schedule J, and his amended Schedule J.

251.    At the March 19th Hearing, the Debtor testified that he is paying his "ex-wife" because "in reality, she's entitled to it as part of the Capital purchase agreement." March 19th Transcript, at p. 22, ln. 5-6.

252.    At the March 19th Hearing, the Debtor testified that the Bidwell Brother had collectively been paid around $3.4 million, which number he described as "off the top of my head . . . probably pretty close." March 19th Transcript, at p. 42, ln. 24-25.

253.    At the conclusion of the March 19th Hearing, the Court continued the hearing on the Turnover Motion to April 24, 2025.

254.    On March 21, 2025, the Court entered the Order Continuing Hearing on Trustee's Motion to Compel Turnover of Property of the Estate (Main Case Docket Entry No. 42, the "Second Continuance Order").

255.    The Second Continuance Order required the Debtor to file with the Court no later than Friday, April 18, 2025 "[a] full accounting of all funds paid by Air Pros Solutions, LLC to

Debtor Scott Bidwell and/or his brothers Jason Bidwell and Mike Bidwell pursuant to the sale of the assets of One Source Home Service, LLC in September 2020. The accounting must state the original obligation, each payment made, any changes to the agreement, and the total amount that each brother received. Further, the accounting must be sworn to under penalty of perjury by all three brothers."

256.   The Second Continuance Order also required the Debtor to deliver to the Trustee by 5:00 p.m. on Friday, April 18, 2025 "[a]ll bank statements reflecting any amount paid by or on behalf of Air Pros Solutions, LLC pursuant to the September 2020 Asset Purchase Agreement between One Source Home Service, LLC as seller and Air Pros Solutions, LLC as buyer;" "[a]ll bank statements for any bank account(s) opened by Debtor Scott Allen Bidwell after October 29, 2024;" and "[a]ll correspondence and documentary evidence (including emails) reflecting any amendment(s) to the September 2020 Asset Purchase Agreement."

### ***The April 24th Hearing***

257.   On April 18, 2025, the Debtor filed the Debtor's Request for Seven Day Extension to Produce Accounting Report (Main Case Docket Entry No. 54, the "Accounting Time Extension Motion").[5]

258.   No hearing on the Accounting Time Extension Motion was obtained or held.

259.   No order on the Accounting Time Extension Motion was entered.

260.   No accounting was filed by the Debtor in advance of the April 24, 2025 continued hearing on the Turnover Motion (the "April 24th Hearing").

261.   The Debtor produced an accounting at the April 24th Hearing (the "Second

---

[5] A seven day extension of the time to deliver the accounting in accordance with the Second Continuance Order, would have been April 25, 2025, the day after the April 24th Hearing.

Accounting").

262.    The Second Accounting was marked and admitted as Debtor's Exhibit 4.

263.    The Second Accounting reflected payments to the Bidwell Brothers from October 16, 2020 through January 1, 2025.

264.    The Second Accounting reflected the disposition of $3,456,700.00 of One Source Sale proceeds.

265.    The Second Accounting reflected that the Debtor received $1,883,207.33.

266.    The Second Accounting reflected that Jason Bidwell received $993,993.33.

267.    The Second Accounting reflected that Mike Bidwell received $579,449.34.

268.    The Second Accounting did not state the original obligation of Air Pros under the APA.

269.    It is unclear whether the Second Accounting stated each payment made by Air Pros on the purchase price of One Source.

270.    The Second Accounting did not state any changes to the APA or the 2022 Amendment.

271.    The Second Accounting was not signed by any of the Bidwell Brothers under penalty of perjury.

272.    The Debtor testified that he did not have time to review the Second Accounting because he received it the night before the April 24th Hearing.  Transcript of Continued Hearing on Motion to Compel, *In re Bidwell* Case No. 24-33412-MVL-7, April 24, 2025, at p. 8, ln. 16-18 (the "April 24th Transcript").

273.    The Debtor later testified that he just saw the Second Accounting thirty minutes

before coming to Court.   Transcript of Continued Hearing on Motion to Compel, April 24th

Transcript , at p. 8, ln. 16-18 and at p. 31, ln. 25.

274.    The Debtor testified that the gross payments received of $3.456 million reflected

on the Second Accounting is accurate, but that the amounts received by each Bidwell Brother are

inaccurate and should be derived by dividing the $3.456 million according to the Informal

40/40/20 Deal. April 24th Transcript, at p. 34, ln. 20-25.

275.    When asked by the Trustee's counsel how "we get to where we have an accurate

statement that [the Debtor] can say is correct," the Debtor responded as follows:

```
 8  A    Like Mr. Holman just said, up there, an act of God.  It's
 9  -- I mean, it's literally five years of incoming transfers,
10  outgoing transfers to multiple people.  Like I said, the total
11  number of balance received, I'm pretty fair that that's an
12  accurate number.
```

*See* April 24th Transcript, at p. 9, ln. 8-12.

276.    The Debtor was unable to point to a single payment from Air Pros that was

divided according to the Informal 40/40/20 Deal.  April 24th Transcript, at pp. 37-38.

277.    The Debtor also testified for the first time at the April 24th Hearing that he is a

former gambling addict.  April 24th Transcript, at p. 24, ln. 24.

278.    The Debtor went on to testify that the first time he "had any gambling issues" was

"after [his] first hearing."  April 24th Transcript, at pp. 24-25, ln. 25-26.

279.    At the conclusion of the April 24th Hearing, counsel for the Trustee stated that the

Trustee was most concerned that the Debtor was not repaying the estate and that any claim the

Trustee might have against Air Pros would likely be a claim in the Air Pros bankruptcy case.

280.    Accordingly, the Court directed the Trustee to file with the Court a list of what she believes the estate is owed based upon postpetition receipts and expenditures within seven (7) days.

281.    The Court gave the Debtor seven (7) days to file a response with the Court to justify expenditures or reduce the amount the Trustee asserts is owed to the estate.

282.    The Court announced that she would review both documents and make a determination of the amount the Debtor should turn over to the Trustee.

283.    On April 25, 2025, the Trustee filed her Trustee's Notice of Estates Funds Received & Not Turned Over (the "Turnover Notice," Main Case Docket Entry No. 57) asserting that the Debtor has failed to turn over a total of $130,700.00 relating to Air Pros Payments into the Debtor's accounts on November 15, 2024; December 13, 2024; December 16, 2024; and January 9, 2025.

284.    On April 25, 2025, the Debtor filed his Response to Trustee's Notice of Estate Funds Received & Not Turned Over (the "Turnover Response," Main Case Docket Entry No. 61), acknowledging receipt of $130,700.00 postpetition from Air Pros and asserting that $31,200.00 should be deducted for payments to Jason Bidwell and Mike Bidwell, $20,500.00 should be deducted for "alimony/maintenance support" payments to Dana Bidwell, and $22,220.50 should be deducted for the Debtor's wildcard exemption and the payment of priority taxes to the Internal Revenue Service.

285.    The Debtor filed the Second Accounting with the Court on April 25, 2025 (Main Case Docket Entry No. 61).

## <u>COUNT I – 11 U.S.C. 727(a)(4)(A) – FALSE OATH</u>

286.    The Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 285.

287.    "The court shall grant the debtor a discharge unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  The party objecting to discharge bears the burden of proving by a preponderance of the evidence that (1) the debtor made the statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.  *Sholdra v. Chilmark, LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001).

288.    Among what constitutes a false oath within the purview of section 727(a)(4)(A) are false statements or omissions by the debtor in the debtor's schedules and statement of financial affairs.  *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992). *See also The Cadle Company v. Guenther (In re Guenther)*, 333 B.R. 759, 766 (Bank. N.D. Tex. 2005).

289.    "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings or the existence and disposition of his property." *Beaubouef*, 996 F.2d at 177.

290.    Fraudulent intent may be shown by a reckless disregard for the truth.   *In re Sholdra*, 249 F.3d at 383 (citing  *Economy Brick Sales, Inc. v. Gonday (In re Gonday)*, 27 B.R. 428 (Bankr. M.D. La. 1983) for the proposition that the cumulative effect of falsehoods together

shows a "pattern of reckless and cavalier disregard for the truth," which supports a finding of fraudulent intent).

291.    "Debtor's showing of reckless indifference to the truth in filling out their schedules and statements is equivalent to showing the requisite fraudulent intent to deceive sufficient to bar discharge under § 727(a)(4)(A)." *In re Guenther*, 333 B.R. at 767.  A chapter 7 debtor has a continuous, affirmative duty to disclose his assets and liabilities and his statement of financial affairs. *Id*. at 766.  The appropriate response when there are errors in the debtor's schedules or statement of financial affairs is to amend immediately and not wait until a party in interest insists upon such amendments.  *Id*. at 786.

292.    To the extent the Defendant did not list assets because he believed they are exempt, the existence of exempt assets is relevant to an assessment of a debtor's financial condition.  *Cf. Kornfield v. Schwartz (In re Kornfield)*, 164 F.3d 778, 784 (2nd Cir. 1999) (finding that, in a section 707(b) context, "the existence of an asset, even if exempt from creditors, is relevant to a debtor's ability to pay his or her debts").

293.    The Debtor's Schedules – including Amended Schedule I and Amended Schedule J – and SOFA filed in this case contain sufficient errors and omissions as to constitute a false oath and/or account under 11 U.S.C. § 727(a)(4)(A).  These errors and omissions include, but are not limited to:

   a.    Failure to list the 2021 Subaru Forester on Schedule A/B;

   b.    Failure to list the Debtor's CashApp account on Schedule A/B;

   c.    Failure to list at least one Bank of America account on Schedule A/B or SOFA 20;

   d.    Failure to list the Debtor's Navy Federal Credit Union accounts on

Schedule A/B;

e.      Failure to list the Debtor's Coinbase account on Schedule A/B;

f.      Failure to list the Debtor's Robinhood account on Schedule A/B or SOFA 20;

g.      Failure to list the receivable owed to the Debtor by Air Pros in connection with the One Source Sale on Schedule A/B;

h.      Characterizing his home lease on Schedule G as an apartment lease, when the Debtor leases a house located at 700 Harwood Tr., Mesquite, TX 75105;

i.      Failure to list income from his roommates' contributions to the monthly rent on line 8h of Original Schedule I;

j.      Inaccurately listing his son's and daughter's ages on Original Schedule J and/or Amended Schedule J;[6]

k.      Failure to list the car payment for the 2021 Subaru on Original Schedule J;

l.      Failure to list the accurate car payment for the Jeep on Original Schedule J;

m.      Failure to list voluntary contributions to Dana Bidwell and to the Debtor's girlfriend on Original Schedule J;

n.      Failure to list on SOFA 5 the prepetition income he received from the One Source Sale;

o.      Failure to list prepetition transfer to Dana Bidwell on SOFA 13;

p.      Failure to list prepetition transfers to his girlfriend on SOFA 13;

q.      Failure to list prepetition transfers to Jason Bidwell on SOFA 18;

r.      Failure to list prepetition transfers to Mike Bidwell on SOFA 18;

s.      Failure to list prepetition transfers to Dana Bidwell on SOFA 18; and

t.      Failure to list prepetition transfers to his girlfriend on SOFA 18.

---

[6] It is implausible that the Debtor's son and daughter are ages 18 and 20 on October 29, 2024, as reflected on Original Schedule J, and are ages 20 and 22 on March 5, 2025, as reflected on Amended Schedule J.  The Debtor's daughter's true age is further muddied by the Debtor's testimony at the March 19th Hearing that she was 21.

294.    Further, the Debtor acknowledged in his testimony that the numbers on Original Schedule I were inaccurate estimates, that he did not realize needed to be exact on his Schedules, and that he signed whatever Debtor's counsel put into his Schedules.

295.    Despite the fact that numerous Meetings of Creditors and hearings on the Turnover Motion revealed numerous errors and omissions in the Debtor's Schedules and SOFA, the only amendments the Debtor has filed are the Amended Schedule I and Amended Schedule J, which the Court directed the Debtor to file and which themselves contain errors.  The Debtor has failed to meet his duty to continuously and accurately disclose.

296.    And despite attesting under penalty of perjury in the filed documents to the accuracy of the Schedules, Amended Schedule I, Amended Schedule J, and the SOFA, the Debtor's disclosures are replete with errors. Some of the errors are minor, such as the ages of his children or whether his home lease was for a house or an apartment, but some are more serious in nature such as the failure to schedule the Debtor's entitlement to payments from Air Pro, the failure to list at least one Bank of America account, the failure to list the Navy Federal Credit Union accounts, the failure to list the CashApp account, the failure to list the Robinhood account, and the failure to list the Coinbase account.

297.    While some of the errors and omissions in the Debtor's Schedules are such that the information was disclosed in an incorrect location in the documents, such as the pontoon boat and trailers being listed in Part 7 of Schedule A/B rather than in Part 2 of Schedule A/B, the number of errors and omissions in the Schedules and SOFA suggests a reckless attitude on the part of the Debtor toward the accuracy of his Schedules and SOFA.

298.    Additionally, the Debtor's sworn testimony at the Meeting of Creditors (including

all continued Meetings of Creditors) and at the hearings on the Turnover Motion is replete with

contradictory, misleading or erroneous statements.

299.    The Debtor's contradictory, misleading, or erroneous testimony includes, but is

not limited to:

      a.  Describing Dana Bidwell alternatively as his ex-spouse, ex-wife, and wife;

      b.  Describing his girlfriend as both his girlfriend and his fiancée;

      c.  The Debtor's shifting testimony why he made monthly payment to Dana
Bidwell – payment of mutual debts, support, and because she is entitled to
payments from the "Capital purchase agreement;"

      d.  Testifying at the February 11th Meeting that he had proposed to his girlfriend
and that she had accepted and then repudiating that testimony two weeks later
at the February 25th Hearing;

      e.  Erroneously testifying at the January 20th Meeting that he had not within the
two years prior to filing for bankruptcy transferred, given, gifted or disposed
of any cash or money or assets in excess of $10,000.00 to anyone, anybody or
any entity;

      f.  Erroneously testifying at the January 20th Meeting that the last payment he
had received toward the purchase price of One Source was $10,000.00 in
December 2024, when, in fact, he had received a payment of $45,000.00 on
January 9, 2025, eleven days prior to the January 20th Meeting;

      g.  Erroneously testifying at the February 25th Meeting that he had no other
accounts on which he had signature authority;

      h.  Testifying at the February 25th Hearing that the entire amount of the payments
made by Air Pros for the purchase of One Source were deposited into his
account until October of 2024, which was later shown to be incorrect when
the Debtor acknowledged under questioning that he had received wire transfer
payments from Air Pros in December of 2024 and January of 2025; and

      i.  Testifying at the April 24th Hearing that the first time he gambled was after his
first hearing when at that first hearing, on February 25, 2025, the Debtor's
testimony was that he had, prior to that hearing, gambled away part of the Air
Pros Payments.

300.    Further, the Debtor's conflicting testimony at the Meeting of Creditors, including all continued meetings, and the hearings on the Turnover Motion, illustrates a cavalier disregard for the truth.

301.    The Debtor's conflicting testimony did not go unnoticed by the Court. At the February 25th Hearing, the Court found that the Debtor's testimony was "at best, equivocal" and expressed that she was not satisfied with the veracity of the Schedules and of the Debtor's testimony at that hearing.  February 25th Transcript, at p. 49, ln. 2-5.   The Court further noted that the Debtor gave very rough estimates of amounts "and those estimates tended to change sentence by sentence."  February 25th Transcript, at p. 49, ln. 6-8.  At the April 24th Hearing the Court colloquially observed that the Debtor, with his testimony, was "in a hole and asking for a shovel."  April 24th Transcript, at p. 27, ln. 7.

302.    Finally, should the Debtor seek to assert an affirmative defense of advice of counsel for his failure to disclose and/or for other errors in his Schedules and SOFA, the Debtor cannot meet his burden.  A debtor who declares under penalty of perjury that he had read the Statement of Financial Affairs and Schedules and that such documents are true and correct, "must accept responsibility for the information in the statements and schedules."  *Texas Commerce Bank, San Angelo, N.A. v. Dreyer (In re Dreyer)*, 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991).  "[A]ttorney error does not absolve a debtor, who signs the petition and schedules under penalty of perjury, from the duty to ensure the information is accurate and complete to the best of his knowledge."  *In re Downey*, 242 B.R. 5, 15 (Bankr. D. Idaho 1999).

303.    For the foregoing reasons, the Court should deny the Defendant's discharge in accordance with 11 U.S.C. § 727(a)(4).

## COUNT II – 11 U.S.C. 727(a)(2)(B) – POSTPETITION
## TRANSFER OF PROPERTY OF THE ESTATE

304.    The Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 303.

305.    "The court shall grant the debtor a discharge unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed . . . property of the estate, after the date of the filing of the petition."  11 U.S.C. § 727(a)(2)(B).

306.    To deny discharge under section 727(a)(2), the plaintiff must prove four elements: (1) a transfer of property; (2) belonging to the debtor or the bankruptcy estate; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor or officer of the estate." *In re Chastant*, 873 F.2d 89, 90 (5th Cir. 1989) (citing *In re Reed*, 18 B.R. 462 (Bankr. E.D. Tenn. 1982)).

307.    In examining intent under section 727(a)(2), courts look to certain "badges of fraud" which "tend to evidence a transfer made with intent to defraud." *Soza v. Hill (In re Soza),* 542 F.3d 1060, 1067 (5th Cir. 2008).   These badges include 1) absence or inadequate consideration; 2) whether the debtor has close or familiar relationship with transferee(s); 3) whether debtor retained possession, benefit, or use of transferred property; 4) the debtor's financial condition before and after the questioned transaction; 5) the overall pattern or course of conduct after "incurring the debt, onset of financial difficulties, or pendency or threat of suits by creditors" and 6) the general timeline of events. *Id.*, citing *Chastant v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989).

308.    Here, the Debtor did not disclose his entitlement to payments from Air Pros in

connection with the One Source Sale. Postpetition, the Debtor received $130,700.00 in Air Pros Payments. These funds were property of the bankruptcy estate. The Trustee discovered the Air Pros Payments by examining the Debtor's bank statements, not from the Debtor's voluntary disclosure. Indeed, the Debtor's testimony at the January 20th Meeting that a $10,000.00 payment he received in December 2024 was the last payment he had received was, at best, misleading and, at worse, false.

309.    Rather than turn the funds over to the Trustee, the Debtor transferred funds to his brothers, his wife, and his girlfriend. The Debtor further used those funds at a gentlemen's club, gambling, shopping, traveling, paying taxes, and purchasing cryptocurrency. The Debtor's failure to disclose his entitlement to the Air Pros Payments and the undisclosed postpetition receipt and transfer of the Air Pros Payments suggest fraudulent intent.

310.    Further, although a small amount, the Debtor's CashApp statements reflect that the Debtor used $439.85 in prepetition funds postpetition, which were arguably property of the estate.

311.    For the foregoing reasons, the Court should deny the Debtor's discharge in accordance with 11 U.S.C. § 727(a)(2)(B).

<u>**COUNT III – 11 U.S.C. § 727(a)(3) – FAILURE**</u>
<u>**TO MAINTAIN BOOKS AND RECORDS**</u>

312.    The Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 311.

313.    "The court shall grant the debtor a discharge unless . . . the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information including books, documents, records, and papers, from which the debtor's financial condition or business

transactions might be ascertained, unless such ac or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The party objecting to discharge under section 727(a)(3) bears the initial burden to show that the debtor failed to keep and preserve their financial records and that this failure prevented the party from ascertaining the debtors' financial condition. *In re Hughes*, 353 B.R. 486, 499 (Bankr. N.D. Tex. 2006) (Jernigan, J.) "The books and records need not be perfect but they should sufficiently identify transactions so that an intelligent inquiry can be made of the transactions." *In re Hughes*, 353 B.R. at 499.

314.    The Debtor has an affirmative duty under section 727(a)(3) to provide books and records that "accurately document his financial affairs." *In re Hughes*, 353 B.R. at 499. Creditors are not required to rely on the debtor's oral recitations or recollections of transactions. *In re Hughes*, 353 B.R. at 500. The Debtor is required to keep and produce records of his financial transactions that provide enough information for creditors and the trustee to ascertain the debtor's financial condition or to track the debtor's financial dealings with "substantial completeness and accuracy for a reasonable period of time in the past." *In re Hughes*, 353 B.R. at 500. Section 727(a)(3) is intended to allow creditors, the Court, and the trustee "to examine the debtor's financial condition *and determine what has passed through a debtor's hands*." *In re Hughes*, 353 B.R. at 501 (emphasis added).

315.    If a debtor fails to maintain and preserve adequate records, the debtor must justify that failure. *In re Hughes*, 353 B.R. at 500. "Depending upon the sophistication of the debtor and the extent of his activities, different record keeping practices are necessary." *In re Hughes*, 353 B.R. at 500.

> "It has been said many times that receiving a discharge in bankruptcy is a privilege, not a right. In order to have entitlement to that privilege, certain

basic financial record keeping by the debtor is of paramount importance.
Record keeping is required for parties in interest to be able to verify the
accuracy of the sworn Schedules and SOFAs and to be certain that the
disclosures are materially accurate. If there are insufficient records, then
there is no way to have a check on the integrity of the Schedules and
SOFAs. The integrity of the bankruptcy process depends upon having some
reasonable and reliable paper trail. The regrettable consequence of failure to
have adequate records must be the denial of a discharge."

*In re Hughes*, 353 B.R. at 502.

316.    In *In re Hughes*, the debtor explained that he kept no bank accounts, but instead

kept all of his money in a drawer in his house, because he wanted to avoid garnishment by the

FDIC in satisfaction of the FDIC's judgment liens against the debtor. *In re Hughes*, 353 B.R. at

502.  The court in *In re Hughes* found that garnishment-avoidance rationale for having no bank

accounts did "not explain why [the debtor] did not keep a simple ledger of the funds deposited in

the drawer and withdrawn from the drawer." *In re Hughes*, 353 B.R. at 502.  "It would have

been very easy for [the debtor] to go to the local dime store and purchase a ledger, and record

deposits of funds into the drawer and withdrawals of funds from the drawer." *In re Hughes*, 353

B.R. at 502-03.

317.    While the Debtor was able to produce bank statements, the APA, and the 2022

Amendment, critically, the Debtor failed to keep and maintain records concerning key

prepetition financial transactions, the receipt and disbursement of the One Source Sale proceeds.

The Debtor admits that he kept no written record of the receipt and distribution of the One

Source Sale proceeds to himself and his brothers.  Like the debtor in *In re Hughes*, it would have

been very easy for Mr. Bidwell to purchase a simple ledger and record deposits from Air Pros

and distributions of those funds to himself and his brothers.  But rather than take that simple step

to ensure the accuracy of the receipt and distribution of funds (including honoring the Informal

40/40/20 Deal with his brothers), the Debtor testified that he kept all of the information regarding

the receipt and distribution of the payments from Air Pros in his head. Written documentation of

the disposition of the One Source Sale proceeds are critical to understanding what the original

obligation under the APA was, what had been paid under the APA by Air Pros as of the Petition

Date, what amount of the original obligation had been forgiven, what amount Air Pros still owed

to the Debtor as of the Petition Date, and how much of the One Source Sale proceeds each of the

Bidwell Brothers had received prepetition.

318.    The Debtor's two accountings filed with the Court were inadequate to give the

Trustee and the Court a complete picture of the disposition of the One Source Sale proceeds.

Without written records of the disposition of the One Source Sale proceeds, the Court, the

Trustee, and the Debtor's creditors cannot know what passed through the Debtor's hands. The

Court, the Trustee, and the Debtor's creditors are not required to rely on the Debtor's memory to

understand the disposition of the One Source Sale proceeds.  To ask that they do so would be

unreasonable.

319.    Accordingly, the Court should deny the Debtor's discharge in accordance with 11

U.S.C. § 727(a)(3).

### COUNT IV – 11 U.S.C. § 727(a)(5) – FAILURE
### TO EXPLAIN LOSS OF ASSETS

320.    The Plaintiff re-alleges and incorporates herein the allegations contained in

paragraphs 1 through 319.

321.    "The court shall grant the debtor a discharge unless . . . the debtor has failed to

explain satisfactorily, before determination of denial of discharge under this paragraph, any loss

of assets or deficiency of assets to meet the debtor's liabilities."  11 U.S.C. § 727(a)(5).  "[T]he

proper focus under [section 727(a)(5) is on the credibility of the proffered explanation rather than the propriety of the disposition of the assets, and an explanation need not even be meritorious to be satisfactory. *** However, the debtor's explanation must consist of more than a vague, indefinite, and uncorroborated hodgepodge of financial transactions. *** A debtor cannot overcome a [section 727(a)(5) objection with mere general explanations; when substantial assets have disappeared from the estate, the debtor must produce documentary evidence." *In re Villarreal*, 666 B.R. 157, 168 (Bankr. N.D. Tex. 2024) (Larson, J.).

322.    The Debtor's explanations of what happened to the prepetition One Source Sale proceeds at the Meeting of Creditors (including continued meetings) and at the hearings on the Turnover Motion were vague and conflicting.  The Debtor's testimony that he kept information regarding the receipt and distribution of payments for the entire multimillion dollar One Source Sale transaction in his head is not credible. The Debtor kept no written accounting of payments made to him by Air Pros or of the amounts he paid over to his brothers as co-sellers.  The Debtor acknowledged at the February 25th Hearing that he could not know the exact amount of the distributions to his brothers, without resorting to a review of written documentation, bank statements, to figure out the total amounts.  Even when the Debtor did resort to written documentation to create the First Accounting and the Second Accounting, they fell short. Indeed, Debtor testified at the April 24th Hearing that the Second Accounting was incorrect.

323.    Moreover, the Debtor's failure to correctly subtract $300,000.00 from $1,000,000.00 during testimony highlights the unreliability of his mental accounting of the One Source Sale proceeds. At the conclusion of the February 25th Hearing, the Court found that the Debtor's explanations shifted "sentence by sentence" and that she was not satisfied with the

veracity of the Debtor's testimony.  Debtor's counsel's argument at the March 19th Hearing that the Debtor did not have the records to make a more detailed accounting lends further support to the fallibility of keeping track of hundreds of thousands of dollars – millions of dollars – in transfers one's head.

324.    The Debtor has neither adequately explained the amount of funds Air Pros paid to him, the amount of funds that are or were due to him from Air Pros as of the Petition Date, nor the amount of funds transferred by the Debtor to his brothers as co-sellers prepetition.

325.    Accordingly, the Court should deny the Debtor's discharge in accordance with 11 U.S.C. § 727(a)(5).

## COUNT V – 11 U.S.C. § 727(a)(4)(D) – FAILURE
## TO COOPERATE WITH THE CHAPTER 7 TRUSTEE

326.    The Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 325.

327.    The Bankruptcy Code provides that the Court shall deny a debtor's discharge if that debtor has withheld from the chapter 7 trustee "any recorded information…related to the debtor's property or financial affairs."  11 U.S.C. § 727(a)(4)(D).

328.    The purpose of section 727(a)(4) is to "ensure that debtors provide all relevant information without the need for lengthy examination and investigations into the affairs of the estate." *Benchmark Bank v. Crumley (In re Crumley),* 428 B.R. 349, 367-68 (Bankr. N.D. Tex. 2010).

329.    The Trustee continued the section 341 meeting five times over five months in order to obtain documents and information from the Debtor so that the Trustee could completely investigate the Debtor's assets and liabilities. The Court, by the Second Continuance Order,

**Complaint**                                                    **Page 55 of 59**

directed the Debtor to produce documents that the Trustee had repeatedly requested and not received. The Debtor did not voluntarily disclose the receipt of the Air Pros Payments to the Trustee. She was left to discover the Air Pros Payment by an examination of the Debtor's prepetition and postpetition bank statements. Upon information and belief, the Trustee has still not received from the Debtor any emails that embody a further amendment or amendments to the APA and the 2022 Amendment.

330.    Additionally, the United States Trustee requested via the Inquiry Letter documents and information be delivered to the United States Trustee by February 28, 2025. Although some of the documents requested were timely delivered to the United States Trustee, others were delivered on April 8, 2025, more than a month after the date by which they were requested to be delivered.  Further, the United States Trustee has still not received from the Debtor any emails that embody a further amendment or amendments to the APA and the 2022 Amendment.

331.    The Debtor's failure to timely provide information to the Trustee and the United States Trustee is grounds for denial of the Debtor's discharge under section 727(a)(4)(D).

## COUNT VI – 11 U.S.C. § 727(a)(6) – FAILURE TO COMPLY WITH COURT ORDERS

332.    The Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 331.

333.    "The court shall grant the debtor a discharge, unless . . . the debtor has refused, in the case . . . to obey any lawful order of the court, other than an order to respond to a material question or to testify."  11 U.S.C. § 727(a)(6)(A).  To carry its burden by a preponderance of the evidence, the party objecting to discharge must show (a) that the court entered an order directed

at the debtor; (b) that the order was lawful; (c) that the order was not one requiring a response to a material question or to testify, and (d) that the debtor refused to obey the order. *In re Wells*, 426 B.R. 579, 608-09 (Bankr. N.D. Tex. 2006). Once the party objecting to discharge meets its burden, the burden shifts to the debtor to explain his or her failure to comply. *Id*. Under section 727(a)(6) a debtor "cannot claim inadvertence or mistake, however, if the evidence presented establishes that the debtor was aware of the orders sent to him and simply disregarded them." *Id*. at 609-10.

334.    At the April 24th Hearing, the Court observed that the Debtor had "provided the Court with . . . two underwhelming attempts at an accounting." April 24th Transcript, p. 41, ln. 8-10.

335.    The Debtor failed to comply with the First Continuance Order by failing to provide an accounting that accounted for all of the funds paid by Air Pros to the Bidwell Brothers.

336.    The Debtor failed to comply with the First Continuance Order by failing to provide an account that stated the original obligation under the APA, each payment made, any changes to the APA, and the total amount each brother received.

337.    Although the Debtor filed the Bidwell Affidavit by which he swore under penalty of perjury that the First Accounting was an "accounting of all monies received and entitled from the agreement with Air Pros Solution, LLC and One Source Home Service was provided by testimony and sworn under penalty of perjury," the Debtor failed to comply with the First Continuance Order because neither the First Accounting nor the Bidwell Affidavit were signed under penalty of perjury by Jason Bidwell and Mike Bidwell.

338.    The Debtor failed to comply with the Second Continuance Order by failing to file accounting of the One Source sale proceeds by April 18, 2025.

339.    The Debtor failed to comply with the Second Continuance Order because the Second Accounting did not state the original obligation of Air Pros under the APA for the purchase of One Source.

340.    The Debtor failed to comply with the Second Continuance Order because the Second Accounting did not state any changes to the APA or the 2022 Amendment.

341.    The Debtor failed to comply with the Second Continuance Order because the Second Accounting was not signed under penalty of perjury by any of the Bidwell Brothers.

342.    The Debtor failed to comply with the Second Continuance Order because, according to the Debtor's testimony at the April 24th Hearing, the Second Accounting was inaccurate.

343.    The Debtor failed to comply with the Second Continuance Order by failing to deliver to the Trustee by 5:00 p.m. on Friday, April 18, 2025 "all correspondence and documentation evidence (including emails) reflecting any amendment(s) to the September 2020 Asset Purchase Agreement."  While the APA and the 2022 Amendment were delivered to the Trustee, emails purported to evidence further amendments to the APA were not turned over the Trustee.

344.    The Debtor was aware of the requirements the Court had set for the First Accounting and the Second Accounting because he was present at the hearings when the Court announced her rulings. Rather than comply with the parameters for the First Accounting and the Second Accounting set forth by the Court, the Debtor twice put together accountings that were

both incomplete and inaccurate.

345.    The Court should deny the Debtor's discharge in accordance with 11 U.S.C. §

727(a)(6)(A).

DATED: May 21, 2025                          Respectfully submitted,

                                             LISA L. LAMBERT
                                             UNITED STATES TRUSTEE, REGION 6

                                             /s/ Meredyth A. Kippes
                                             Meredyth A. Kippes
                                             State Bar No. 24007882
                                             Office of the United States Trustee
                                             1100 Commerce Street, Room 976
                                             Dallas, Texas  75242
                                             (214) 767-1079
                                             meredyth.kippes@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that I sent copy of the foregoing document via CM/ECF or via First Class United States Mail on May 21, 2025 to the following parties.

                                             /s/  Meredyth A. Kippes
                                             Meredyth A. Kippes

Scott Allen Bidwell
700 Hardwood Tr.
Mesquite, TX 75150

Guy H. Holman
Guy Harvey Holman, PLLC
8330 Lyndon B Johnson Fwy, Suite 445
Dallas, TX 75243

Anne Elizabeth Burns
Chapter 7 Trustee
900 Jackson Street, Suite 570
Dallas, TX 75202